BABCOCK & WILCOX EBENSBURG POWER, INC., and Ebensburg Investors Limited Partnership Trading as Ebensburg Power Company, Plaintiffs,

v.

ZURICH AMERICAN INSURANCE COMPANY, Liberty International Underwriters and Liberty Insurance Under Writers, Inc., Defendants.

No. CIV.A. 02–299J.

United States District Court,
W.D. Pennsylvania.

Oct. 12, 2004.

**388**

John M. Sylvester, Esq., Heath B. Monesmith, Esq., Kirkpatrick & Lockhart, Pittsburgh, PA, for Plaintiffs.

Richard F. Andracki, Esq., Andracki Law Offices, Pittsburgh, PA, Steven D. Johnson, Hecker, Brown, Sherry & Johnson, Philadelphia, PA, for Defendants.

### MEMORANDUM OPINION AND ORDER

GIBSON, District Judge.

This case comes before the Court on Zurich American Insurance Company's (hereinafter "Defendant") Motion for Summary Judgment on Damages Resulting from Turbo Care's Negligent Repair Work (Document No. 92) and Motion for Summary Judgment Regarding Gradual Cracking (Document No. 96). In consideration of the Defendant's above-listed motions, Babcock & Wilcox Ebensburg Power, Incorporated and Ebensburg Investors Limited Partnership (hereinafter "Plaintiffs") responses thereto, oral argument, and the record in the case *sub judice,* the Court denies the Defendant's motions for the following reasons.

### JURISDICTION

Jurisdiction is proper in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. § 1332, in that all Plaintiffs to the above-captioned civil action are citizens of different states than all Defendants, and the subject matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs. Specifically, Plaintiff, Babcock & Wilcox Ebensburg Power, Incorporated is a Delaware corporation with its principal place of business in Barberton, Ohio. Plaintiff, Ebensburg Investors Limited Partnership, the sole limited partner of Ebensburg Power Company, is a Pennsylvania partnership with its principal place of business in Cambria County, Pennsylvania. Both Plaintiffs trade and do business as Ebensburg Power Company (hereinafter "Ebensburg"). Ebensburg seeks an amount exceeding $75,000.00 exclusive of interest and costs.

Defendant, Zurich American Insurance Company, is a New York Corporation with its principal place of business in New York, New York. Defendant, Liberty Insurance Underwriters, Incorporated, is a New York Corporation with its principal place of business in New York, New York. Therefore, none of the Plaintiffs in the case *sub judice* is a citizen of the same state as any of the Defendants.

## FACTUAL BACKGROUND

The civil action arises from an insurance coverage dispute between Ebensburg and the Defendant, Zurich American Insurance Company.[1] (Document Nos. 112, 116, & 119). In this coverage action, there were three first-party property policies issued to Ebensburg: (i) Zurich issued to Ebensburg insurance policy no. MCP 2946252 00 (Document No. 93, Exhibit A) for the period February 14, 1999 through February 14, 2002; (ii) Zurich issued to Ebensburg insurance policy no. MCP 3709390 00 (Document No. 93, Exhibit B) which provides 62% of the coverage to Ebensburg for the period February 14, 2002 through February 14, 2003; and (iii) Liberty issued insurance policy no. DA 073408001012, which provides the remaining 38% of the coverage to Ebensburg for the period February 14, 2002 through February 14, 2003. (Document No. 112, Exhibit M). Pursuant to the terms of the property policies issued by the Defendant, Ebensburg has filed a claim for damages and loss of business income with regard to damage to a steam turbine used to convert steam into electricity. *Id.*

Ebensburg owns and operates a 50–megawatt cogeneration power plant, located in Ebensburg, Pennsylvania. (Document Nos. 112, 116 & 119). Pursuant to the terms of a contract between Ebensburg and GPU/Pennsylvania Electric Company (hereinafter "Penelec"), Ebensburg supplied Penelec with electricity.[2] *Id.* In order to generate electricity for Penelec, Ebensburg utilizes a "circulating fluidized bed boiler to burn waste coal to produce steam to make electricity." (Document Nos. 116 & 119). The original stem rotor and turbine are at issue in this litigation, as well as the "cost and need for the replacement rotor."[3] *Id.*

"Ebensburg produces electricity by generating steam from the combustion of the waste coal. The heat from the combustion process is used to heat water in order to produce superheated steam. The steam is injected into the steam turbine through a steam inlet valve where the thermal energy in the steam is converted into mechanical energy by rotating the rotor in the turbine which, in turn, drives the generator, which produces electricity. Once the wet steam has left the turbine, it flows to the condenser where all the steam is condensed to water and returned to the heating cycle as water." (Document No. 112; *see also* Document No. 119).

"The turbine is a multi-stage, condensing turbine manufactured by Siemens De-

---

1. The Defendant, Liberty International, and Ebensburg have entered into an agreement thereby removing the Defendant Liberty International from the above-captioned civil action. (Oral Argument, August 25, 2004). Accordingly, any reference to the "Defendant" in the remainder of the Court's discussion will denote Zurich American Insurance.

2. Penelec is Ebensburg's only customer for electricity. (Document No. 112).

3. Although the Plaintiff does not specifically assert that the replacement rotor is at issue in the case *sub judice,* the need for a replacement rotor, as well as the cost of the replacement rotor are two of the issues raised in the Defendant's Motion for Summary Judgment at Document No. 96 and Defendant's Motion for Summary Judgment on Damages Resulting from Turbo Care's Negligent Repair Work at Document No. 92. Thus, the Court concludes that the replacement rotor and its cost are at issue in this civil action.

mag Delaval ("Siemens"). The turbine rotor consists of sixteen ... [sets of blades, with each set being called a 'stage'.] There is one 'row' of turbine blades on each stage of the rotor, except for the first which has two rows. There are sixteen stages and, therefore, there are seventeen rows of blades on the rotor. The blades are affixed to the rotor stages in rows 12, 13, 14 and 15 [by what is] sometimes referred to as a ball and shank attachment. Within the steam turbine, the production of energy occurs as the steam expands through the stages. As the steam passes through each stage, it expands against the rotor blades applying a torque to the shaft of the rotor. The rotor shaft drives a generator that produces the electricity." (Document No. 112; *see also* Document No. 119). There is also an area in the turbine referred to as the "saturation line"; however, the parties dispute the location of the saturation line in the turbine.[4] (Document Nos. 112 & 119).

On or about May 22, 2001, during a planned outage in order to perform scheduled maintenance of the turbine, Ebensburg discovered cracking in the rotor of the steam turbine at rows 12 and 13. (Document Nos. 112, 116 & 119). Specifi-

cally, the cracking was discovered in the rims of the rotor at rows 12 and 13 (hereinafter "first turbine loss"). *Id.* Upon discovery of the cracking at rows 12 and 13, Ebensburg decided that in order to repair the damaged rotor at rows 12 and 13, it would be necessary to machine off[5] the damaged rims and perform a weld build up repair of the rims, including cutting new slots for the rotor blades[6] and installing new blades. *Id.* However, it was determined that the repair could not be performed until April of 2002; therefore, the rotor was returned to service with rows 12 and 13 missing from the rotor. *Id.*

In April of 2002, the steam turbine was shutdown for a scheduled outage, during which rows 12 and 13 were to be repaired. The rotor was removed from the steam turbine, and it was shipped to a repair facility TurboCare, Incorporated (hereinafter "TurboCare") in Houston, Texas. (Document Nos. 112, 116 & 119). On or about April 29, 2002, during an inspection of the rotor at TurboCare, additional cracking was discovered on the rims of rows 14 and 15, similar to the cracking discovered on rows 12 and 13. *Id.* It was determined by Ebensburg that the same repair that was to be performed on rows

---

4. Specifically, the Defendant contends that the saturation line, or the area in the turbine where the steam begins to condense into water, "would begin to form in the Ebensburg turbine around rows 11 and 12 .... [W]hen those rows were removed, the transition line would move back." (Document No. 119, Michael Mindock Deposition, Exhibit 13); *see also* David Daniels Deposition (stating that the Wilson line is close to the saturation line, but the Wilson line is "hotter" than the saturation line); Ronald Munson Deposition; Mike Thomas Deposition (stating that the Wilson line is not known among turbine experts as the saturation line, rather, the saturation line is "farther back in the machine"); William Stefurak Deposition; Gary Anderson Deposition; and Michael G. Thomas Deposition.

Conversely, Ebensburg alleges that "[t]his saturation line is in front of, or further up in

the turbine, than rows 12 through 15 of Ebensburg's turbine rotor." (Document No. 112, Mindock Deposition, Exhibit F); *see also* David Daniels Deposition; Ronald Munson Deposition; Mike Thomas Deposition; William Stefurak Deposition (showing the location of the saturation line ahead of rows 12–15); Gary Anderson Deposition; and Michael G. Thomas Deposition.

5. In this context, "machine off" refers to the removal of the damaged portion of the rims. *See* Document Nos. 112, 116 & 119.

6. The weld build up repair, which includes cutting new slots for the rotor blades, is a process known as "indexing." *See* Document Nos. 112, 116 & 119.

12 and 13 would also be performed on rows 14 and 15. *Id.*

The repair of rows 12 and 13 was successful. (Document Nos. 112, 116 & 119). However, the repair of rows 14 and 15 was not successful in that the turbine rotor was returned to service from July 2002 through May 2003 without rows 14 and 15. *Id.*

The origin of the cracking in rows 12 and 13 is disputed between Ebensburg and the Defendant. Specifically, Ebensburg claims that "instantaneous cracking" or "brittle fracture cracking" was the cause of the cracking at rows 12 and 13; therefore, this mechanical breakdown is covered in its property policies issued by the Defendant.[7] (Oral Argument, August 25, 2004). Ebensburg also contends that the cracking at rows 14 and 15 was caused by "instantaneous cracking." *Id.* With regard to the repair by TurboCare of rows 14 and 15, Ebensburg argues that a genuine issue of material fact exists as to whether the subsequent unsuccessful repair by TurboCare of rows 14 and 15 was caused by the negligence of TurboCare, or whether the instantaneous cracking at rows 14 and 15 was the proximate result of a mechanical breakdown in the turbine rotor itself. *Id.* Accordingly, Ebensburg asserts that any decision by Ebensburg to replace rows 14 and 15, rather than repair the rows was an appropriate business decision based upon many variables, such as its contract with Penelec.[8] *Id.*

The Defendant, however, disputes the cause of the cracking at rows 12, 13, 14, and 15. Specifically, the Defendant asserts that the cracking is the result of "gradual cracking"[9] or "stress corrosion cracking" which is specifically excluded from coverage under the terms of the policies issued by the Defendant to Ebensburg.[10] (Oral Argument, August 25, 2004).

7. Ebensburg states that the policies issued by the Defendant to Ebensburg are "all-risk policies that cover damage to property and 'mechanical breakdowns' of equipment, including the turbine rotor at the Ebensburg Plant, and any resulting loss of business income." (Document No. 112). Conversely, the Defendant asserts that the policies "speak for themselves . . . [and i]t is admitted only that the respective Zurich policies afford coverage according to their terms and conditions." (Document No. 119). The Defendant also admits "only that the Ebensburg steam turbine is insured property under the terms and conditions of the respective Zurich policies." *Id.* Furthermore, the Defendant admits "that the movement in the industry has been to combine a property policy and a boiler and machinery policy into one all risk property policy". *Id.* Additionally, "[b]oiler and machinery risks are included in the coverage of the policy" in the case *sub judice. Id.*

8. Pursuant to a contract between Ebensburg and Penelec, Ebensburg claims that it was required to "meet certain performance obligations, and a failure to do so may give Penelec the option of terminating the contract." (Document No. 112, Gary Anderson Deposition). Conversely, the Defendant alleges that

Ebensburg "requested and received Force Majeure status" which "suspended obligations and liabilities of Ebensburg to the extent made necessary by and during the continuance of the Force Majeure." (Document No. 119, Gary Anderson letter to Gary T. Miner at GPU Energy, Exhibit W).

9. Both parties have admitted that "reasonable minds could differ on the meaning of gradual"(Document No. 119); however, the Defendant argues that the assertion by Ebensburg that the "term 'gradual' can mean different things to different people" (Document No. 112) is "irrelevant because Plaintiff has not raised the issue that the insurance policy is ambiguous" (Document No. 119); *but see* Document No. 96, ¶¶ 21–22; Section C, *infra.*

10. The "gradual cracking" exclusion included in the policies states the following:

This Policy does not insure loss, damage or expense caused directly or indirectly by any of the following . . . such loss, damage or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

9. Corrosion, rust, decay, depletion, deterioration, erosion, evaporation, inher-

Furthermore, the Defendant argues that the "faulty repair" by TurboCare of rows 14 and 15 was the proximate cause of the cracking in rows 14 and 15 discovered after the unsuccessful repair. Thus, the Defendant argues that the faulty workmanship provision also excludes coverage under the terms of the policies issued by the Defendant.[11] *Id.* The Defendant further asserts that Ebensburg should have permitted TurboCare to properly repair rows 14 and 15 at no additional cost, rather than Ebensburg replacing rows 14 and 15 at a substantially higher cost. *Id.*

Ebensburg seeks a loss of business income and property damage resulting from the first turbine loss discovered on May 22, 2001. (Document No. 112). Specifically, Ebensburg asserts that in order to avoid a complete shutdown of the power plant, the "outer rims of both rows 12 and 13" were "machined off of the rotor disc and the turbine was put back into operation without blade rows 12 and 13." *Id.* The result of resuming operations without rows 12 and 13 during the period from June 2001 until April 2002 was a loss of 6.2% production in power. *Id.* The total claim asserted by Ebensburg due to the first turbine loss is a "total of $6,847,400.00 in property damages, extra expenses and business income losses." *Id.*

In contrast, the Defendant admits that rows 12 and 13 were machined off; however, it does not agree that "these actions were taken to avoid a loss of business income associated with a complete shutdown of the plant." (Document No. 119). Furthermore, the Defendant disagrees with Ebensburg on the "amount and method of measurement of the loss", as this issue is also in dispute between the parties. *Id.*

Ebensburg also seeks a loss of business income and property damage resulting from the second turbine loss discovered in April of 2002. (Document No. 112). Ebensburg asserts that the second turbine loss "caused Ebensburg to completely shutdown electrical generating operations from April 29, 2002 until July 7, 2002." *Id.* In an effort to resume production, Ebensburg "placed the turbine back into opera-

---

ent vice, latent defect, leakage, loss of weight, marring or scratching, bulging, gradual cracking, shrinkage, wear and tear, wet or dry rot or any quality in property, which causes it to damage or destroy itself.

Exclusions 9 through 12, 14 and 15 apply unless direct physical loss or damage by an insured peril ensues, and then only to the extent otherwise covered by this policy, any direct physical loss or damage directly resulting from such insured peril is covered. (Document No. 112, Exhibit K, at p. 12; Exhibit L, at p. 13; Exhibit M, at p. 9).

Conversely, Ebensburg asserts that the "ensuing loss" provision quoted above "specifically cover[s] Ebensburg for property damage and mechanical breakdowns even if certain exclusions, including the 'gradual cracking' exclusions, are found to apply." (Document No. 112).

11. The "faulty workmanship" exclusion in the relevant policies provides the following:

This Policy does not insure loss, damage or expense caused directly or indirectly by any of the following ... such loss, damage or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.

\* \* \* \* \* \*

14. Cost of making good:
B. Faulty or defective workmanship, materials and supplies, unless direct physical loss or damage by an insured peril ensues and then this policy will cover for such ensuring loss or damage only.

\* \* \* \* \* \*

Exclusions 9 through 12, 14 and 15, apply unless direct physical loss or damage by an insured peril ensues, and then only to the extent otherwise covered by this policy, any direct physical loss or damage directly resulting from such insured peril is covered.

(Document No. 112).

tion without rows 14 and 15, resulting in reduced power output from the generator and further lost business income." *Id.* The reduced power output lasted during the period from July 2002 until May 2003, and Ebensburg asserts that the result of resuming operations without rows 14 and 15 was a loss of 5.1% production in power. *Id.* Furthermore, in order to replace rows 14 and 15 after the attempted repair of these rows failed, Ebensburg had to completely shutdown its operations "during the period of May 13, 2003 until approximately May 24, 2003, thereby resulting in additional lost power output and lost business income." *Id.* The claim asserted by Ebensburg due to the second turbine loss is a "total of $6,056,550.00 in property damages, extra expenses and business income losses." *Id.*

Ebensburg admits that during the attempted repair by Ebensburg of rows 14 and 15, before Ebensburg decided to replace rows 14 and 15, TurboCare "used resistance heating pads and decided to hang the rotor vertically during the repair process in order to avoid damaging the other completed sections of the rotor." (Document No. 112). It is argued by Ebensburg that the employees of Turbo-Care never determined "the cause of the weld cracks that developed [in rows 14 and 15] during the weld repair process." *Id.* Thus, before attempting a second repair on rows 14 and 15, Ebensburg maintains that "it would be necessary to determine why the welds failed *before* doing another weld repair." *Id.* However, the uncertainty of the success of a second attempted weld repair, the potential loss of business income in order to attempt a second repair, safety concerns regarding Ebensburg employees, and the existing contract with Penelec resulted in Ebensburg's decision to purchase a replacement rotor rather than attempt a second repair of rows 14 and 15. *Id.* Consequently, Ebensburg asserts that the cost of purchasing the replacement

rotor is a direct result of the original operational cracks discovered in April of 2002. *Id.*

The Defendant admits that after the discovery of the cracking in rows 14 and 15, the rows were cut from the rotor disc and TurboCare was authorized by Ebensburg to repair rows 14 and 15. (Document No. 119). However, the Defendant argues that during the repair process, "a machining error occurred when TurboCare did not index a slot for one of the blades properly, cutting it too deep." *Id.* The Defendant also contends that an analysis performed by M & M Engineering supports the claim that faulty workmanship was the cause of the unsuccessful repair of rows 14 and 15. *Id.* Thus, the Defendant concludes that the cost of purchasing the replacement rotor is a direct result of negligent repair work by TurboCare. *Id.*

While it is admitted by the Defendant that the shutdown of operations during the period between May 13, 2003 until approximately May 24, 2003 resulted "in some loss of power output and a loss of business income", the Defendant disputes that the "loss in power output and any subsequent loss of business income is the result of the cracking discovered on April 29, 2002." *Id.* Rather, a "large portion of the damages claimed by Plaintiffs are [sic] the direct result of the negligent repair work of TurboCare and not the cracking discovered on April 22, 2002." *Id.* Moreover, the Defendant claims that the lost business income suffered by Ebensburg from the second turbine loss is also the result of "gradual cracking". (Document No. 119). The Defendant also disagrees with Ebensburg on the "valuation and method of measurement of the loss" with regard to business income loss as the result of the cracking discovered on April 22, 2002. *Id.* Thus, although it is admitted that Ebensburg suffered a loss of business income due to operating without rows 14

and 15, the "amount and method of measurement is in dispute between the parties." *Id.*

## PROCEDURAL BACKGROUND

On or about October 25, 2002, Ebensburg commenced a civil action at Docket No. 2002–3629 in the Court of Common Pleas of Cambria County, Pennsylvania. (Document No. 1). Ebensburg sought a determination of rights and duties under various policies of insurance for damages and loss allegedly suffered by Ebensburg with regard to two turbine losses. *Id.*

On or about November 19, 2002, Defendant, Zurich American, filed a notice of removal from the Common Pleas of Cambria County to the United States District Court for the Western District of Pennsylvania. (Document No. 1). Throughout the following year, various discovery issues were determined before the Honorable Robert J. Cindrich and a special discovery master.

On or about September 30, 2003, Ebensburg filed a Motion for Bill of Costs, including a brief and affidavit in support of the motion.[12] (Document No. 46). Thereafter, the Defendant filed a Response to the Motion for Bill of Costs by Ebensburg. (Document No. 47).

On or about October 30, 2003, the above-captioned civil action was assigned to the Honorable Kim R. Gibson. After the parties were granted additional time in which to prepare expert reports, all expert depositions were to be completed by May 26, 2004. (Document No. 82).

On or about July 29, 2004, a status conference was held in order to determine the remaining issues before the Court, and to schedule a date for a requested oral argument on the remaining pending motions before the Court. (Document No. 102). The pending motions to be argued before the Court were the Defendants', Liberty International and Liberty Insurance, Motion for Summary Judgment at Document No. 90, the Defendant's, Zurich American, Motion for Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work at Document No. 92, and the Defendant's, Zurich American, Motion for Summary Judgment at Document No. 96. (Document No. 102).

On August 25, 2004, an oral argument on the motions was heard by the Court.[13] During the hearing, the Court heard argument on Defendant's Motion for Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work at Document No. 92, and the Defendant's Motion for Summary Judgment Regarding Gradual Cracking at Document No. 96. (Document No. 102). The Court also heard argument raised in Ebensburg's Response (Document No. 109) and Sur–Reply (Document No. 126) in Opposition to Defendant's Motion for Summary Judgment Regarding Gradual Cracking, where Ebensburg asserts that the Defendant's untimely filed statement of material facts in support of Defendant's Motion for Summary Judgment at Document No. 96 should be stricken for failure to comply with Local Rule 56.1.

## STANDARD OF REVIEW

Summary judgment may only be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that

---

**12.** The Court observes that Ebensburg's Motion for Bill of Costs is a pending motion before this Court, and it shall be addressed in a separate memorandum opinion.

**13.** The Court was notified at the oral argument hearing that the Defendants, Liberty Insurance and Liberty International, reached an agreement with Ebensburg; therefore, they would not be participating in the oral argument before the Court on August 25, 2004. (Document No. 128).

there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R.Civ. P. 56(c). Rule 56 mandates the entry of summary judgment, after adequate time for discovery and upon motion, against the party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In considering a motion for summary judgment, this Court must examine the facts in a light most favorable to the party opposing the motion. *International Raw Materials, Ltd. v. Stauffer Chemical Co.,* 898 F.2d 946 (3d Cir.1990). The burden is on the moving party to demonstrate that the evidence creates no genuine issue of material fact. *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893 (3d Cir.1987).

A fact is "material" only if its existence or non-existence would affect the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505. Where the non-moving party will bear the burden of proof at trial, the party moving for summary judgment may meet its burden by showing that the evidentiary materials of record, if reduced to admissible evidence, would be insufficient to carry the non-movant's burden of proof at trial. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548.

## DISCUSSION

### A. Local Civil Rule 56.1

"On motions for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." Local Civil Rule 56.1. Upon serving its motion for summary judgment, the Defendant failed to submit a 56.1 Statement in compliance with L.Civ.R. 56.1. Ebensburg raised the Defendant's omission in its opposition brief and argued that the Defendant's motion was procedurally defective. (Document No. 126).

In the Defendant's late filed Concise Statement of Material Facts in Support of Defendant's Motion for Summary Judgment (Document No. 116) and during oral argument before the Court, the Defendant responded to Ebensburg's argument by asserting that the Defendant "reasonably relied upon Thompson/West's Pennsylvania Rules of Court, Federal, 2004 Edition, which *does not contain* a Local Rule 56.1 for the United States District Court, Western District of Pennsylvania." *Id.* Furthermore, the Defendant claims that its untimely filed Concise Statement of Material Facts "contains the same facts as espoused in [the] Defendant['s] Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment on the issue of gradual cracking, filed with the Court on or about June 14, 2004" at Document No. 96. (Document No. 116). Thus, the Defendant asserts that it has complied with L.Civ.R. 56.1 as its previously filed Motion for Summary Judgment and Brief in Support of Motion for Summary Judgment contains the factual averments necessary for the Court to decide the Motion for Summary Judgment. *Id.*

In contrast, Ebensburg claims that the Defendant's argument is "unconvincing" and "untenable". (Document No. 126). In particular, Ebensburg asserts that the Defendant has "ignored the January 21, 2003, Order on Motion Practice" filed by the Honorable Robert J. Cindrich, which clearly directed the parties to refer to the court's website regarding practices and procedures of the Court. *Id.* In addition, the Order dated January 21, 2003 expressly stated that "[e]very motion for summary

judgment and supporting brief; if based on the affirmative proof of facts, shall be accompanied by a statement of material facts not in dispute." *Id* (*quoting* Order on Motion Practice dated, January 21, 2003).

 Although the Court routinely requires a party to include a L.Civ.R. 56.1 Statement with his or her motion, "failure to do so may be excused where there is no evidence of bad faith." *New Jersey Environmental Federation v. Wayne Tp.,* 310 F.Supp.2d 681, 689 (D.N.J.2004); *see Fowler v. Borough of Westville,* 97 F.Supp.2d 602, 606–607 (D.N.J.2000). In the case *sub judice,* the Court determines that although the Defendant's L.Civ.R. 56.1 Statement was untimely filed, the Defendant immediately corrected the procedural error upon notification. Furthermore, the Defendant has filed a L.Civ. 56.1 Statement from which the Court can determine whether a genuine issue of material fact exists regarding the issues raised by the Defendant in the motions for summary judgment. The Court determines that these actions do not reflect bad faith on the part of the Defendant. Accordingly, the Court accepts the statement of facts included in the Defendant's L.Civ.R. 56.1 Statement and considers the assertions therein in performing an analysis of the pending motions. Thus, the Court finds that the current Motion for Summary Judgment Regarding Gradual Cracking (Document No. 96) is not procedurally defective and will proceed with an analysis of the legal issues before the Court.

## B. Choice of Law

Pursuant to *Erie R.R. v. Tompkins,* 304 U.S. 64, 78, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), a federal court sitting in diversity must apply state substantive law and federal procedural law. *Chamberlain v. Giampapa,* 210 F.3d 154, 158 (3d Cir. 2000); *Kruzits v. Okuma Mach. Tool Inc.,* 40 F.3d 52, 55 (3d Cir.1994) (citing *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941)). This substantive/procedural dichotomy must be applied to ensure that the "outcome of the litigation in the federal court [will] be substantially the same, so far as legal rules determine the outcome of a litigation, as it would be if tried in a State court." *Guaranty Trust Co. v. York,* 326 U.S. 99, 109, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945) (quoted in *Chamberlain,* 210 F.3d at 159).

"Pennsylvania courts generally honor the intent of the contracting parties and enforce choice of law provisions executed by them." *Kruzits,* 40 F.3d at 55 (citing *Smith v. Commonwealth Nat. Bank,* 384 Pa.Super. 65, 557 A.2d 775, *appeal denied,* 524 Pa. 610, 569 A.2d 1369 (1990)) (quoted in *Elliott & Frantz, Inc. v. Svedala Industries, Inc.,* 1997 WL 799449, *3 (E.D.Pa. 1997)). In the case *sub judice,* the parties are sophisticated business entities who have entered into insurance coverage policies on a couple of occasions. Although the Court has not been directed to any language in the contract whereby a choice of law provision exists, Ebensburg in its initial complaint and subsequent pleadings has relied on the law of the Commonwealth of Pennsylvania with regard to substantive law to be applied at trial. Similarly, the Defendant has cited to Pennsylvania case law when presenting arguments to the Court. The Defendant also addressed the choice of law issue in its Motion for Summary Judgment on Zurich American Insurance Company's Counterclaim for Declaratory Relief[14] (Document No. 93).

---

14. The Defendant's Motion for Summary Judgment at Document No. 93 was withdrawn on July 16, 2004 through a Stipulation by Babcock & Wilcox, Ebensburg Investors, and Zurich American at Document No. 106.

■ In the Motion for Summary Judgment at Document No. 93, Defendant argued that "[u]nder Pennsylvania law, the state where the insurance policy was contracted, which is where it is delivered, governs interpretation of an insurance contract. *Cat Internet Services, Inc. v. Internet Supply, Inc.,* 333 F.3d 138, 141 (3d Cir.2003)." [15] The Court notes that while the Defendant's assertion is correct, the conclusory statement precedes an appropriate analysis. Specifically, a federal court sitting in diversity begins its analysis by applying the choice of law rules of the forum state. *Elliott & Frantz, Inc.,* 1997 WL 799449 at *3. Next, the federal court must "determine whether there is a false conflict [16] [or true conflict] between the ostensibly completing bodies of law." *Aircraft Guar. Corp. v. Strato–Lift, Inc.,* 951 F.Supp. 73, 76–77 (E.D.Pa.1997); *see also LeJeune v. Bliss–Salem, Inc.,* 85 F.3d 1069, 1071 (3d Cir.1996). If a true conflict exists, then the federal court engages in Pennsylvania's "hybrid" choice of law analysis. *Aircraft Guar. Corp.,* 951 F.Supp. at 77 (*citing Tersco, Inc. v. E.I. DuPont de Nemours And Co.,* 879 F.Supp. 445, 447 (E.D.Pa.1992)).

■ In applying the hybrid choice of law analysis to a contract action, a federal court examines "(1) the place of negotiation, contracting and performance of the contract in question; (2) the location of the subject matter of the contract; and (3) the parties' citizenship." *Aircraft Guar. Corp.,* 951 F.Supp. at 77 (*quoting Kramer v. Nowak,* 908 F.Supp. 1281, 1285 (E.D.Pa. 1995)). Accordingly, while the Defendant is correct in stating that the federal court looks to the state where the policy was contracted and where the contract was delivered, the federal court engages in such examination only if a true conflict exists. Presently, no arguments have been raised regarding a competing body of law or a choice of law provision in the policy. Indeed, Ebensburg asserts in its Brief in Opposition to the Defendant's Motion for Summary Judgment Regarding Gradual Cracking that "[t]he parties are in agreement that Pennsylvania law governs this insurance coverage dispute since the policies were issued to a Pennsylvania company to cover risks located in Pennsylvania." (Document No. 109, p. 9, fn. 31). Accordingly, the Court determines that under the facts of the case *sub judice,* the Court shall apply the substantive law of the Commonwealth of Pennsylvania to the insurance policies coverage at issue.

## C. Motion for Summary Judgment Regarding Gradual Cracking

The Court shall set forth the procedural history regarding this particular summary judgment motion in an effort to clarify the claims and responses thereto.

The Defendant filed a Motion for Summary Judgment Regarding Gradual Cracking at Document No. 96. Ebensburg filed a Brief in Opposition to the Defendant's Motion for Summary Judgment Regarding Gradual Cracking at Document No. 109.

---

However, the Court acknowledges the Defendant's argument with regard to the appropriate choice of law to be applied in the case *sub judice.*

**15.** The Court observes that the facts in *Cat Internet Services, Inc.* are distinguished from the facts in the case *sub judice* in that the insurance contracts involved in *Cat Internet Services, Inc.* were "issued by a Pennsylvania agent to Pennsylvania corporations." *Cat Internet Services, Inc.,* 333 F.3d at 141. In contrast, the entities involved in this civil litigation are incorporated in Delaware, New York, and Pennsylvania.

**16.** A "false conflict exists where 'only one jurisdiction's governmental interests would be impaired by the application of the other jurisdiction's law.'" *Aircraft Guar. Corp.,* 951 F.Supp. at 77 (*quoting LeJeune,* 85 F.3d at 1071).

Thereafter, the Defendant filed a Reply Brief at Document No. 117. Ebensburg was granted leave to file a Sur–Reply Brief at Document No. 126. Accordingly, the Court has reviewed these documents along with the remainder of the record in the case *sub judice* in order to determine whether the movant, Defendant Zurich American, has met the burden under Federal Rule of Civil Procedure 56(c) to establish that no genuine issue of material fact exists with regard to the cause of cracking at rows 12 and 13, discovered in May 2001, and rows 14 and 15 discovered in April 2002.

An essential claim asserted by the Defendant is that the cause of cracking, discovered at rows 12 and 13 in May 2001 and rows 14 and 15 in April 2002 was gradual cracking, which cause is specifically excluded from coverage under the terms of the two policies at issue in the case *sub judice*. (Document No. 96). Conversely, Ebensburg argues that the cracking was the result of an intergranular brittle fracture, resulting from overload force. (Document No. 109). In the alternative, Ebensburg claims that even if gradual cracking is determined to be the cause of the cracking at rows 12, 13, 14, and 15, then pursuant to the "ensuing loss" provision in the policies, any damage or losses stemming from an "insured peril," such as "non-gradual cracking" and/or "mechanical breakdowns" will be covered under the ensuing loss provision. (Document No. 112, ¶¶ 37–38).

Based upon the arguments set forth by the parties, the Court observes that the following issues have been presented to the Court: (1) whether the Defendant has met its burden pursuant to Fed.R.Civ.P. 56(c) that no genuine issue of material fact exists with regard to the cause of cracking at rows 12 and 13, discovered in May 2001, and the cause of cracking at rows 14, and 15 discovered in April 2002, such that

"gradual cracking" was the cause; (2) whether the exclusion provision in the section of the policies entitled "EXCLUDED CAUSES OF LOSS", which includes gradual cracking and/or corrosion cracking, applies to the facts of the case *sub judice;* and (3) if the exclusion provision does apply, whether Ebensburg is entitled to coverage for damages and losses pursuant to the ensuing loss provision. (Document Nos. 96 & 109); *see also* Document No. 112, Exhibit K, at p. 12; Exhibit L, at p. 13; Exhibit M, at p. 9.

The Court observes that the threshold issue presented in the Defendant's Motion for Summary Judgment Regarding Gradual Cracking (Document No. 96) centers on the Court's interpretation as a matter of law of the meaning of the term "gradual cracking" in the exclusion provision provided in the insurance policies. Whether the term "gradual cracking" is "ambiguous" is an initial determination that necessarily lies with the Court. *Ready Food Products, Inc. v. Great Northern Ins. Co.*, 417 Pa.Super. 643, 612 A.2d 1385, 1387 (1992).

> In making that determination, the court must assess the writing as a whole and not in discrete units. [citations omitted]. A contract is 'ambiguous' if 'reasonably intelligent persons ... would differ regarding its meaning.' *Musisko v. Equitable Life Assur. Soc.*, 344 Pa.Super. 101, 106, 496 A.2d 28, 31 (1985). [citations omitted]. Thus, we will not allow an overly-subtle or technical interpretation to defeat the reasonable expectations of the insured. [citation omitted]. On the other hand, we will not convolute the plain meaning of a writing merely to find an ambiguity. [citations omitted].

*Ready Food Products, Inc.*, 612 A.2d at 1387.

The Court also observes that the Defendant is asserting an affirmative defense in arguing that the exclusion provi-

sion applies under the facts of the case *sub judice. Compagnie Des Bauxites De Guinee v. Insurance Co.*, 554 F.Supp. 1075, 1076 (D.C.Pa.1983), *aff'd.*, 794 F.2d 871 (3d Cir.1986). Accordingly, the Defendant bears the burden of proving that the exclusion is applicable. *Id.*

The "gradual cracking" exclusion included in the policies states the following:

> This Policy does not insure loss, damage or expense caused directly or indirectly by any of the following ... such loss, damage or expense is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the loss.
>
> > 9. Corrosion, rust, decay, depletion, deterioration, erosion, evaporation, inherent vice, latent defect, leakage, loss of weight, marring or scratching, bulging, gradual cracking, shrinkage, wear and tear, wet or dry rot or any quality in property, which causes it to damage or destroy itself.
>
> Exclusions 9 through 12, 14 and 15 apply unless direct physical loss or damage by an insured peril ensues, and then only to the extent otherwise covered by this policy, any direct physical loss or damage directly resulting from such insured peril is covered.

(Document No. 112, Exhibit K, at p. 12; Exhibit L, at p. 13; Exhibit M, at p. 9).

■ Notably, the Court recognizes that the competing testimonies of Defendant's expert witnesses and Ebensburg's expert witnesses reach different conclusions regarding the cause of the cracking at rows 12 and 13, discovered in May 2001, and the cause of cracking at rows 14 and 15 discovered in April 2002. Specifically, the Defendant offers various expert reports, including the expert report of Mike Thomas, Ph.D. (Document No. 90, Exhibit K) who concludes that the cracking at rows 12, 13, 14 and 15 was caused by gradual cracking. *Id.* Alternatively, the Plaintiff offers the expert report of Robert S. Carbonara, Ph.D. (Document No. 115, Exhibit HH) who concludes that the cracking at rows 12, 13, 14, and 15 was caused by an "intergranular brittle fracture, resulting from an overload force". *Id.*

The competing expert testimonies also reveal an inability to pinpoint with accuracy the definition and/or measure of when gradual cracking is initiated. For example, the Defendant directs the Court's attention to the expert report of Ronald Munson, Ph.D., expert metallurgist, who concluded that the cracks in rows 12, 13, 14, and 15 were the result of a slow and gradual process known as "stress corrosion cracking". (Document No. 97). The Defendant further argues that the "phenomena of stress corrosion cracking ... is a gradual process", and "that this gradual process, stress corrosion cracking, is a single phenomenon encompassing the elements of corrosion, stress and susceptible material...." *Id.* Thus, according to the Defendant, this "stress corrosion cracking, a metallurgical process which incepts and propagates by degree" caused the Ebensburg losses in 2001 and 2002.[17] *Id.*

17. The Court observes that the Defendant somewhat obfuscates the issue(s) before the Court in its Reply Brief at Document No. 117 when Defendant states the following:

> Ebensburg's attempt to lay strawmen before the Court is not better evidenced than in its Brief in Opposition and Concise Statement of Facts, where it misleadingly suggests that several causes other than stress corrosion cracking could have caused Ebensburg's losses in 2001 and 2002 notwithstanding the fact that the issue before the Court is 'gradual cracking,' **and not stress corrosion cracking.**

(Document No. 117, p. 4) (emphasis in original). However, in its earlier brief, the Defendant clearly asserted that stress corrosion cracking, a gradual process, caused Ebensburg's losses in 2001 and 2002. (Document No. 96, pp. 8–9).

The Court merely notes the unclear distinctions in the record in order to underscore the

The Defendant also contends that Ebensburg is seeking damages and losses for "extensive cracks found in the rotor, and not small initial cracks that they allege happened 'instantaneously'." (Document No. 97, p. 14). However, the Defendant argues that the "extensive" cracking for which Ebensburg seeks coverage is specifically excluded by the "gradual cracking" exclusion in the policies as these extensive cracks were caused by the "process of stress corrosion cracking, which is within the confines of the gradual cracking exclusion". *Id.*

Initially, Ebensburg asserts that it is "undisputed that the Policies exclude from all risk coverage only 'gradual' cracking". (Document No. 112, ¶ 32). Moreover, the record in this case supports the claim that "non-gradual" cracking is covered under the terms of the policy. *Id.* However, Ebensburg argues that it is a factual determination for the jury to decide what is "gradual" cracking and what is "non-gradual" cracking where a genuine issue of material fact exists regarding the definition of these terms. *Id.* at ¶ 33. For example, Ebensburg directs the Court's attention to the testimony of Mr. Tracy Smith [18] who stated that "[i]f [cracking] is not gradual, then it's possibly sudden." (Document No. 114, Exhibit S, p. 95). However, when responding to the inquiry whether "over a period of time ... if the cracking occurred over an hour ... is that non-gradual", Mr. Smith stated: "It could be, and then it couldn't be. That's what I'm saying, it's very hard to define." *Id.* at p. 114. The Court also observes that when asked whether "any time an event occurs over a period of time, no matter how short that period of time is, ... would

[Mr. Smith] consider it slow", Mr. Smith responded that "it's something you have to evaluate all of the circumstances of. I don't know if you can make a blanket opinion of, if it's [sic] happens in ten years, it's slow, if it happens in one day, it's fast. *You have to look at the nature of the crack and what caused the crack."* *Id.* at p. 103. (emphasis added).

Ebensburg also contends that the "relevant inquiry" is "whether the *initiation* of the cracking" at rows 12, 13, 14, and 15 was gradual, "and not whether the subsequent *propagation* of the cracking was gradual." (Document No. 109, p. 12) (emphasis in original). Specifically, Ebensburg acknowledges the testimony of William Klemm, manager of boiler machinery claims for the Defendant, who responded to questions posed by Ebensburg as follows:

Q: When you think of gradual cracking as used in this policy ... are you focused on the initiation of the cracking being gradual or the propagation of the cracking being gradual?

[Klemm]: I'm thinking that the propagation of the cracking is gradual.

Q: If a crack occurs instantaneously and then propagates over time, does it convert from a sudden crack to a gradual crack, as you understand gradual cracking in the terms of this policy?

[Klemm]: No.

(Document No. 114, Exhibit Q, p. 279). The Court observes that the testimony of William Klemm highlights the ambiguous nature of whether gradual cracking occurs at the appearance of the first "sudden" crack, or whether gradual cracking is de-

highly technical nature of the terms employed by the experts and to emphasize the seemingly ambiguous nature of the term "gradual cracking" as it is applied in the context of the case *sub judice.*

18. Mr. Tracy Smith is employed by Giles & Smith Insurance Technical Services and retained by the Defendant as the primary property adjuster for Ebensburg's claim. (Document No. 112, fn. 12).

fined in this context as slow sudden propagation cracking.

Based upon the record, the Court also recognizes that not only is the definition of "gradual" easily affected by the technical nuances of how the Ebensburg turbine rotor operates, the issue of whether "gradual" cracking occurs is also factually dependant upon the presence of other elements. For instance, the Court determines that the following genuine issues of material fact remain with regard to whether the cracking discovered at rows 12, 13, 14, and 15 in 2001 and 2002 resulted from "gradual" cracking, and how the term "gradual" is to be defined in the context of the Ebensburg turbine rotor: (1) whether the morphology of the cracking reveals evidence of stress corrosion cracking or intergranular brittle fracture, resulting from an overload force; (2) whether the location of the cracking reveals evidence of stress corrosion cracking or intergranular brittle fracture, resulting from an overload force; (3) whether the stresses present on the Ebensburg rotor were consistent with stress corrosion cracking; (4) whether a caustic[19] environment existed in the Ebensburg turbine rotor such that a caustic compound would be deposited in the turbine rotor causing cracking; and (5) if caustic compounds were present in the Ebensburg turbine rotor, where were they deposited in relation to the Wilson line, saturation line, and phase transition line.[20] Accordingly, the Court determines that based upon the record in the case *sub judice*, a genuine issue of material fact exists with regard to the interpretation of "gradual cracking" set forth in the exclusionary clause of the insurance policies. Indeed, the competing testimonies of the parties' expert witnesses with regard to the detection of "gradual cracking" as opposed to the distinction from "non-gradual cracking" reveals a susceptibility of the various interpretations of the

19. Caustic refers to an environment "[c]apable of corroding, burning, dissolving, or otherwise eating away by chemical action". *Webster's II New College Dictionary*, p. 178 (2001).

20. According to the testimony of Michael Thomas, the following distinctions are to be made between the above mentioned lines:

Q: The term used for the location of the turbine where the water droplets start to form is the Wilson line. Do you see that?
[Thomas]: Yes.
Q: That point where water starts precipitating out from the steam in the turbine, you refer to it as the Wilson line, is it also known among turbine experts as the saturation line?
[Thomas]: No; I think the saturation line is farther back in the machine, you know, back where you've got, I don't want to say 100 percent humidity, but that's basically where it is. It's farther back.

\* \* \* \* \* \*

Q: So, you are saying the Wilson line comes first, and then the saturation line comes later?

[Thomas]: I think so. I think, in fact, the transition phase line is just before the Wilson line, and you got the Wilson line, then you got a saturation line back there.
Q: So, starting from the inlet side going to the outlet side, there's a transition line, then there's a Wilson line, then there's a saturation line?
[Thomas]: I think it's called phase transition.

(Document No. 113, Exhibit E, pp. 550–551). Michael Thomas then testifies as to the distinction between each line. *Id.* at pp. 551–552.

Based upon the record, the Court recognizes that the importance in determining the location of the aforementioned lines may bear upon the factual inquiry of whether stress corrosion cracking can occur once condensation is present. (Document No. 113, Exhibit A, p. 21). However, whether the Defendant can support its claim that caustic compounds were present in the Ebensburg turbine rotor which subsequently caused stress corrosion cracking at rows 12, 13, 14, and 15 is a genuine issue of material fact to be determined by the jury.

"gradual cracking" exclusionary provision in the policies. Furthermore, the Court determines that a genuine issue of material fact exists with regard to the cause of cracking discovered at rows 12, 13, 14 and 15 in may 2001 and April 2002. Therefore, the Court denies the Defendant's Motion for Summary Judgment Regarding Gradual Cracking.

■ Another issue before the Court is whether the ensuing loss provision applies to the case *sub judice*, such that Ebensburg is entitled to coverage "for property damage and mechanical breakdowns even if certain exclusions, including the 'gradual cracking' exclusions, are found to apply." (Document No. 112). In its review of the record, the Court determines that whether the ensuing loss provision applies depends upon whether it is determined by the trier of fact that non-gradual cracking resulted from the alleged stress corrosion cracking.

Ebensburg asserts that even if gradual cracking is determined to be the cause of the cracking at rows 12, 13, 14, and 15, Ebensburg is still entitled to coverage under the ensuing loss provision as Ebensburg's rotor suffered a catastrophic separation of the turbine rotor, separate and distinct from the alleged gradual cracking event. (Document No. 109). Moreover, Ebensburg argues that it suffered a covered, ensuing mechanical breakdown of the rotor, which also entitles Ebensburg to coverage under the terms of the policies. *Id.* Specifically, Ebensburg states that since the policies issued to Ebensburg "are a comprehensive form of property insurance providing coverage for both the risk of damage to property and for typical boiler and machinery risks, including 'mechanical breakdowns' of 'objects,' such as the turbine rotor", Ebensburg is entitled to coverage because "mechanical breakdowns" are a covered peril. *Id.* Accordingly, Ebensburg asserts that the covered peril, a mechanical breakdown, occurred

when the turbine rotor ceased to be operational. *Id.*

The ensuing loss provision provides as follows:

Exclusions 9 through 12, 14 and 15 apply unless direct physical loss or damage by an insured peril ensues, and then only to the extent otherwise covered by this policy, any direct physical loss or damage directly resulting from such insured peril is covered.

(Document No. 112, Exhibit K, at p. 12; Exhibit L, at p. 13; Exhibit M, at p. 9). The Court finds the testimony of C. Bruce Bitler, Regional Vice President, Underwriter for Zurich North America, instructive in interpreting the ensuing loss provision included in the insurance policies at issue. (Document No. 114, Exhibit P, pp. 78–101.) C. Bruce Bitler responded to questions posed by Ebensburg in the following manner:

Q: What is your understanding of what the word breakdown means?

[Bitler]: That it doesn't work.

Q: And your understanding is that Ebensburg would be covered for the inability of its objects to work, assuming all of the other terms and conditions are met?

\* \* \* \* \* \*

[Bitler]: If the cause is a result of an insured peril, the cause of loss.

\* \* \* \* \* \*

[Bitler]: The purpose [of the definition section of the policy] is really to determine which deductible applied, because if it's a covered peril and it's not excluded, it's going to be covered within the policy.

\* \* \* \* \* \*

Q: . . . [I]f you have a breakdown of an object that results in a fire that spreads and causes a bunch of proper-

ty damage, looking at the definition of accident [where fire is not defined as an accident], it would appear that that would not be considered an accident. . . . Does that mean that that type of loss would not be covered under a different provision under the policy?

[Bitler]: If it's a fire loss and it's not excluded by the policy, then it's covered subject to the deductible.

Q: The fact that fire is not included as part of an accident doesn't mean that it's excluded?

[Bitler]: Correct.

\* \* \* \* \* \*

Q: . . . [C]an you describe for me the overall purpose of the exclusions as the underwriter on the account?

\* \* \* \* \* \*

[Bitler]: You don't want to cover something that is just going to wear out. If it rusts, for example, rust occurs to bare metal, so you don't want to cover that. If an engine doesn't have oil, it will have a major problem, and it will wear out a lot quicker, so you don't want to cover ordinary wear and tear, because engines do wear out.

Q: Fair enough. This policy purports to exclude for gradual cracking. Do you see that?

[Bitler]: Yes, I see that.

Q: I assume, then, that the policy does cover for cracking that's non gradual; correct?

[Bitler]: I guess that would be true.

\* \* \* \* \* \*

[Bitler]: The policy has a wear and tear exclusion, because this policy is not a maintenance policy. If somebody is not maintaining their equipment properly, you're not going to cover something that happens to the equipment because of poor maintenance.

Q: Right. You're not going to cover the actual cost of cleaning up the corrosion, for example?

[Bitler]: Or the fact that it just wears out from ordinary use.

\* \* \* \* \* \*

Q: Would you agree that if you had, for example, corrosion that resulted in the sudden and accidental breakdown of an object, that the corrosion itself wouldn't be covered because of the exclusion [provision] . . . but you might be covered for the sudden and accidental breakdown because the definition of accident does not exclude corrosion from its definition?

\* \* \* \* \* \*

[Bitler]: The definition of accident does not include the word corrosion, but corrosion is within the exclusions in the policy.

Q: For the property damage portion of the policy; correct?

[Bitler]: Property damage has to occur before any other coverage applies; in other words, you can't just have a [business interruption] loss, you have to have property damage first before business interruption occurs.

Q: But you can also have a sudden and accidental breakdown loss too; correct?

[Bitler]: Within the policy, yet, if it's not excluded.

(Document No. 114, Exhibit P, pp. 78–94). In other words, according to the above-cited testimony, if the cracking is caused by corrosion, the corrosion would be excluded under the terms of the policy; however, any resulting "sudden and accidental breakdowns" may be covered if it is not excluded by the terms of the policy. Furthermore, if the cracking is caused by gradual cracking, any loss suffered due to subsequent mechanical breakdown would

be covered under the terms of the ensuing loss provision of the policies.

Q: If you have corrosion that somehow leads to some piece of equipment deteriorating, exploding, causing a fire, you would agree that the fire is at least an ensuing loss that is potentially covered under this policy?

[Bitler]: Yes.

\* \* \* \* \* \*

Q: ... If you have corrosion resulting in non-gradual cracking or a fire, you would agree that the non-gradual cracking or fire could be an ensuing loss under this provision?

\* \* \* \* \* \*

[Bitler]: Can you ask it again.

\* \* \* \* \* \*

Q: ... You would agree that if corrosion results in a fire, that fire is potentially covered under this policy?

[Bitler]: Yeah, you would exclude the corrosion and you would pick up the resulting fire.

Q: And that's because the fire is not excluded under the policy; correct?

[Bitler]: Correct.

Q: Similarly, if you have corrosion that results in non-gradual cracking, just like the fire, couldn't the non-gradual cracking be an ensuing loss under the policy?

\* \* \* \* \* \*

[Bitler]: I guess that's possible.

(Document No. 114, Exhibit P, pp. 99–101).

Based upon the above testimony and the record in the case *sub judice*, the Court observes that at least two factual issues must be resolved by the finder of fact before a determination can be made with regard to whether the ensuing loss provision applies to Ebensburg's claims: (1) whether the cracking at rows 12 and 13 discovered in May 2001 and at rows 14 and 15 discovered in April 2002 was caused by a "sudden" event such that the damages are covered under the terms of the policies; and (2) if gradual cracking is determined to be the cause of cracking at rows 12, 13, 14, and 15, whether a subsequent "mechanical breakdown" resulted which would trigger the application of the ensuing loss provision. Furthermore, the Court observes that the record reflects ambiguity as to the definition of mechanical breakdown based upon the factual circumstances of the case *sub judice*.

The testimony of William Klemm reveals the lack of clarity surrounding when the Ebensburg turbine rotor can be considered to have failed "mechanically".

Q: What do you understand mechanical breakdown to be in the context of a policy such as [the Ebensburg policy]?

[Klemm]: Mechanical breakdown is when something breaks.

\* \* \* \* \* \*

[Klemm]: *You have to know why it won't operate.*

Q: What difference would it make, why it can't operate?

[Klemm]: I'm trying to think of an example. My problem in answering your question is, generally I agree, but I don't want to say in all cases that is the case. It could be ... a rotating pump, say, that had ingested some sort of debris and it was plugged up. And, so, it is not broken. It just needs to be ... cleaned. There is no breakdown of the pump.

Q: If a mechanical device ceases to operate, in other words, you turn on the switch and it doesn't work, doesn't operate, is that a mechanical breakdown?

[Klemm]: No, not in and of itself. Why doesn't it operate?

\* \* \* \* \* \*

Klemm: ... I'm reluctant to say, you know, arbitrarily that just because it doesn't work that it is broken.

(Document No. 114, Exhibit A, pp. 98–100) (emphasis added). Although the record reveals that the ensuing loss provision would provide coverage for a "mechanical breakdown" subsequent to an excluded loss, whether a "mechanical breakdown" occurred with regard to the Ebensburg turbine rotor is a genuine issue of material fact which initially needs to be determined.

Accordingly, the Court determines that based upon the record in the case *sub judice,* the ambiguity presented in interpreting the definition of mechanical breakdown as it applies to the Ebensburg turbine rotor is a genuine issue of material fact to be determined by the jury. Furthermore, whether the ensuing loss provision applies as argued by Ebensburg is also a genuine issue of material fact which precludes the Court from making a determination regarding whether Ebensburg is entitled to coverage of loss resulting from the cracking at rows 12, 13, 14, and 15.

**D. Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work**

 Again, the Court sets forth the procedural history regarding this particular summary judgment motion in an effort to clarify the claims and responses thereto.

Defendant, Zurich American, Joined the Motion for Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work filed by Liberty International at Document No. 90 (Document No. 92). Ebensburg then filed a Brief in Opposition to the Defendant, Zurich American, at Document No. 108. Thereafter, the Defendant, Zurich American, Joined the Reply Brief by Liberty International in Further Support of the Motion for Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work

filed at Document No. 124 (Document No. 118). The Court granted Ebensburg permission to file a Sur–Reply in Opposition to the Motion for Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work (Document No. 127). Accordingly, the Court has reviewed these documents as well as the rest of the record in the case *sub judice* in order to determine whether the movant, Defendant Zurich American, has met its burden under Federal Rule of Civil Procedure 56(c).

The Defendant asserts that the Court should grant summary judgment in favor of the Defendant for the following reasons:

[A]ll damages claimed by Ebensburg after the indexing error and improper post-weld heat treatment by TurboCare during the repair of rows 14 and 15 are not recoverable under the [Zurich American] policy because: (1) the damages are the direct result of TurboCare's negligent repairs which constitute 'faulty workmanship' and as such are specifically excluded from coverage under the terms of the Policy; (2) the turbine rotor could have been repaired rather than replaced; under the terms of the Policy, [Zurich American] only owes the amount 'that would be necessary to repair, rebuild or replace, whichever is the least'; and (3) any business income loss incurred after the indexing error and improper post-weld heat treatment was not the result of 'direct physical loss or damage to the property insured by a peril insured', as required by the insuring agreement of the Policy, but rather was the direct result of TurboCare's negligent repair work.

(Document Nos. 124 & 118). In its Reply Brief, the Defendant also attempts to clarify Ebensburg's alleged confusion with regard to the Defendant's argument in support of its Motion for Summary Judgment on Damages Resulting from TurboCare's

Negligent Repair Work. Specifically, the Defendant argues that it has not suggested in its motion that the "cracks discovered on April 29, 2002 (referred to by Ebensburg as operational cracks and/or the Second Turbine Loss) are the result of faulty workmanship", rather, the unsuccessful repair of rows 14 and 15 in June 2002 "is the direct result of TurboCare's negligent workmanship." *Id.* Accordingly, the Defendant asserts that no coverage should be afforded to Ebensburg for the damages that arose as a result of the negligent repair work. *Id.*

Conversely, Ebensburg provides the three following arguments with regard to its claims:

*First,* [the Defendant] assert[s] that Ebensburg's claimed damages for the Second Turbine Loss are the direct result of TurboCare's negligent repairs. Ebensburg disputes this assertion and will ask the jury to find that all of its damages are the proximate result of the operational cracks in the turbine rotor discovered in April 2002.

\* \* \* \* \* \*

*Second,* [the Defendant] assert[s] that 'the turbine rotor could have been repaired rather than replaced.' Ebensburg not only disputes this assertion, but contends that it is irrelevant. Although [the Defendant has] proffered experts to opine that Rows 14 and 15 ... could have been repaired, ... the fact remains that the only attempt at such repair failed—and a jury could conclude that a successful second attempt would not necessarily have been successful, particularly when there is no definitive evidence as to the cause of the repair failure.... [T]his factual issue ...is irrelevant [however] to Ebensburg's claim because Ebensburg made a business judgment to replace, rather than repair, the rotor as the proper means of mitigating its damages from the Second Turbine Loss.

\* \* \* \* \* \*

*Third,* [the Defendant] assert[s] that any business income loss incurred by Ebensburg after the Second Turbine Loss was not the result of a covered loss, but rather was the result of TurboCare's negligent repair work.... Ebensburg ... disputes this assertion of fact. Ebensburg has put forth evidence and expert testimony to prove that its business income loss on the Second Turbine Loss was a consequence of the operational cracks discovered in April 2002.

(Document No. 127).

Reviewing the record, the Court observes that evidence exists which creates a genuine issue of material fact regarding the following: (1) the cause of the cracking at rows 14 and 15 discovered in April 2002; (2) whether the cracking discovered in the area of rows 14 and 15 after the unsuccessful repair were caused by TurboCare's attempted repair, or whether another cause exists; (3) whether any business income loss incurred after the unsuccessful repair was the result of "direct physical loss or damage to the property insured by a peril insured"; and (4) whether Ebensburg attempted to mitigate losses by making the business decision to replace the rotor rather than repair the rotor.

Initially, the Court observes that the cause of cracking discovered at rows 14 and 15 in April 2002 has been addressed in the Court's analysis of the Defendant's Motion for Summary Judgment Regarding Gradual Cracking, section C, *supra.* Moreover, the Court recognizes that the cause of cracking at rows 14 and 15 discovered in April 2002 may be directly related to the cause of cracking at rows 14 and 15 discovered in June 2002 after the unsuccessful repair by TurboCare. Consequent-

ly, whether the cracking in the area of rows 14 and 15 discovered in June 2002 was directly related to the cracking discovered in April 2002 presents a question of material fact also to be determined by the trier of fact.

The Court also notes that whether any business income loss incurred after the unsuccessful repair of rows 14 and 15 was the result of "direct physical loss or damage to the property insured by a peril insured" depends upon the cause of the cracking at rows 14 and 15, which is a question of fact to be determined by the jury. In other words, if the fact finder in the case *sub judice* determines that the cause of cracking discovered at rows 14 and 15 in April 2002 is the same cause of cracking discovered in the area of rows 14 and 15 in June 2002, then the fact finder must next determine whether such causation is covered under the terms of the policy entered into by the parties. Accordingly, the cause of the cracking at rows 14 and 15 discovered in April 2002, and whether any business income loss incurred after the unsuccessful repair was the result of "direct physical loss or damage to the property insured by a peril insured" are questions of fact to be determined by the trier of fact.

With regard to the cause of the cracking in the area of rows 14 and 15 discovered in June 2002, after the attempted repair by TurboCare, the Defendant offered testimony to support the claim that the later cracking was indeed caused by the unsuccessful repair. For example, in his expert report, L. Clark McDonald, Ph.D. concluded that "the lack of any indications during non-destructive inspections after welding and rough machining, and the nature of the fractures, indicates that the post-weld cracking at Rows 14 and 15 was associated with thermally induced stresses generated when the localized resistance heat treatment was used in place of the induction heat treatment." (Document No. 90, Exhibit J). Additionally, Ronald Gladden, a repair specialist at TurboCare in Texas, testified that he was not "aware of the cracks before" the machining error occurred. (Document No. 90, Exhibit G, p. 114).

The Court observes that the testimony of Ronald Gladden provides an example of a genuine issue of material fact that exists with regard to the cause of the subsequent cracking in the areas at rows 14 and 15. For instance, Ebensburg asserts that even though Ronald Gladden stated that he was not aware of the cracks before the machining error occurred, he also testified that he didn't "know when [the cracking in the area of rows 14 and 15] occurred." (Document No. 90, Exhibit G, p. 114). Ronald Gladden also testified that he is "at a total loss as to what caused the cracks." (Document No. 113, Exhibit EE, p. 18). Additionally, Ebensburg offers the testimony of Jack Daniels, a mechanical engineer for TurboCare of Houston, which provides that the cause of the weld cracks that developed during the repair of rows 14 and 15 was never determined. (Document No. 113, Exhibit FF, pp. 48–49).

Other facts provided in the record indicate to the Court that a genuine issue of material fact exists with regard to whether the unsuccessful repair caused the cracking in the area of rows 14 and 15 discovered in June 2002. Indeed, a jury could determine that a cause other than the machinist's error and subsequent resistance heating employed by Turbo Care was the cause of the cracking discovered after the weld repair was attempted. For example, there is evidence in the record which suggests that TurboCare "always [has] the choice of resistance or induction" heating to complete weld repairs. (Document No. 90, Exhibit H, p. 73). The existence of this choice leads the Court to infer that both are acceptable methods of weld

repair in the industry. Furthermore, based upon the testimony of Mr. Gladden, the reason that resistance heating, whereby the unit hangs vertically during repair instead of hanging horizontally as is done during induction heating, was performed on the later discovered cracks in the area of rows 14 and 15 is "the other wheels were finished and these slots were cut all the way around and we needed to control their expansion and growth to keep them from distorting, because some of these ... were finished. And there's no way of doing that with the induction heating." (Document No. 90, Exhibit G, pp. 98–99). Accordingly, based upon the above mentioned testimonies and the court record, the Court determines that the Defendant has not met its burden with regard to the cause of cracking in the area of rows 14 and 15 discovered in June 2002, after the unsuccessful repair by TurboCare. Whether the unsuccessful weld repair caused the cracking or whether another explanation exists for the cause of cracking is a question of fact to be determined by the trier of fact.

█ The Court also observes that a genuine issue of material fact exists as to whether Ebensburg attempted to mitigate losses by making the business decision to replace the rotor rather than repair the rotor. For instance, the Defendant offers testimony which supports its claim that a re-repair of rows 14 and 15 could have been performed successfully. (Document No. 90, Exhibits H & G). In fact, testimony from Gary Anderson, the plant manager at the Ebensburg Plant, indicates that Siemens, the manufacturer of the turbine rotor at the Ebensburg Plant, recommended that a re-repair be conducted at rows 14 and 15. (Document No. 90, Exhibit E, p. 138).

Conversely, Ebensburg offers evidence to support its claim that the decision to replace the rotor was appropriate under the circumstances. For example, Gary Anderson testified that it would be necessary to determine the cause of the unsuccessful repair at rows 14 and 15 before performing a re-repair. (Document No. 113, Exhibit G, pp. 138–139.) Furthermore, Gary Anderson stated that he recalled it was one of the Defendant's consultants who raised the idea of a replacement rotor. (Document No. 90, Exhibit E, p. 77). Ebensburg also offers the testimony of Mike Mindock, formerly a turbine design engineer at Siemens, who stated that there was reluctance to re-weld at rows 14 and 15 until testing could be performed on the process. (Document No. 113, Exhibit F, pp. 151–152).

The Court determines that based upon the record in the case *sub judice*, the Defendant has not met its burden to demonstrate that the evidence creates no genuine issue of material fact. Specifically, Ebensburg has offered sufficient evidence to create a genuine issue of material fact with regard to the following: (1) the cause of the cracking at rows 14 and 15; (2) whether the subsequent cracks discovered at rows 14 and 15 after the unsuccessful repair were caused by TurboCare's attempted repair or whether another cause exists; (3) whether any business income loss incurred after the unsuccessful repair was the result of "direct physical loss or damage to the property insured by a peril insured"[21]; and (4) whether Ebensburg

---

21. The Court observes that whether the cracking in the area of rows 14 and 15 discovered in June 2002 is factually determined to be the result of faulty workmanship on the part of TurboCare directly impacts upon whether the "faulty workmanship" exclusion applies in the case *sub judice*. Accordingly, as the former issue is a genuine issue of material fact to be determined by the jury, the later determination of whether the exclusion applies also depends upon the factual determination made by the jury.

attempted to mitigate losses by making the business decision to replace the rotor rather than repair the rotor. Accordingly, the Defendant is not entitled to judgment as a matter of law, and the Court denies the Defendant's Motion for Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work

An appropriate order follows.

## ORDER

AND NOW, this 12th day of October, 2004, **IT IS HEREBY ORDERED** that the Defendant's Motion for Summary Judgment on Damages Resulting from TurboCare's Negligent Repair Work is denied.

**IT IS FURTHER ORDERED** that the Defendant's Motion for Summary Judgment Regarding Gradual Cracking is also denied.